CLARENCE A. PETERSON AND ENID M. PETERSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65889. Filed June 20, 1958.

*Clinton F. Seccombe, Esq.*, for the petitioners.
*Eugene F. Reardon, Esq.*, for the respondent.

WITHEY, *Judge:* The respondent has determined a deficiency of $1,964.98 in the income tax of the petitioners for 1952. The only issue for determination is whether the petitioners are entitled to deduct $25,000 as a casualty loss.

### FINDINGS OF FACT.

The petitioners, who are husband and wife, reside in Los Angeles, California, and timely filed their joint income tax return for 1952 with the district director in that city.

During August 1951, or prior thereto, the petitioners acquired at a cost of $11,027 a building lot in the Bel-Air area of Los Angeles. The Bel-Air area is mountainous and rolling and consists largely of peaks, hillsides, and valleys. The petitioners' lot, which later came to be known as 150 Ashdale Place, is on a sharply sloping hillside. In order to build a house, a garage, and a swimming pool on the lot and to have some level ground around them, it was necessary to fill in a portion of the back part of the lot with dirt. Some of the dirt was compacted and some was not. A retaining wall 185 feet in length with a substantial footing was erected on the lower side of and completely around the filled-in area. The elevation of the lot drops from approximately 100 feet at the Ashdale Place level to an elevation of from 55 feet to 65 feet at the toe of the slope which was below the retaining wall. The petitioners' lot is located at one end of Ashdale Place. At that end of the street and at a somewhat higher elevation than petitioners' lot there is a city drain or sewer for taking care of the surface drainage from approximately two blocks which also have a higher elevation than petitioners' lot.

During the late summer or fall of 1951 the petitioners constructed on the lot a garage and a swimming pool and began the construction of a residence. The swimming pool was built entirely on the compacted filled-in portion of the lot while only a part of the garage and part of the house were built on the compacted filled-in portion of the lot.

On January 15, 1952, the residence was still under construction with the greater portion of the required work thereon having been completed. To January 15, 1952, the petitioners had paid or incurred a total of $87,053 for the lot and the improvements thereon.

During December 29 and 30, 1951, a rainfall totaling about 3.74 inches occurred in the Bel-Air area. This resulted in a few small gullys being cut in a portion of the filled-in area of the lot. This damage, which was minor, was promptly repaired by petitioners by throwing some broken concrete in the gullies and putting dirt thereon.

During January 12 and 13, 1952, a rainfall totaling 1.71 inches occurred in the Bel-Air area. This was followed 2 days later by a rainfall which began on January 15 and continued through January 18 and totaled 10.19 inches. As a result of the latter rainfall water came down the hillside above the property of the petitioners and flowed down Ashdale Place in a stream extending from curb to curb. By the night of the second day of the rainfall the drain or sewer at the end of Ashdale Place had become stopped up and water from the street flowed over on to petitioners' property, passing between the residence and the garage and down the hillside back of the residence. By the end of the rainfall and as a result of the water passing over the property of the petitioners a gully 6 feet deep had been cut in the compacted filled-in portion of the property, between 25 and 30 feet of the retaining wall had been destroyed, much of the footing of the remainder of the retaining wall had been so undermined that it was left in a state of practical suspension, and a substantial portion of the dirt contained in the compacted filled-in area had been washed down the hillside to a street below the retaining wall. No damage was done to the swimming pool, the garage, and the residence or to the portion of the ground on which they stood.

By March 1, 1952, construction of the residence had been completed, or so nearly so that on that date the petitioners moved into it and at all times since have continued to own and to occupy the property as their residence.

In their income tax return for 1952 the petitioners took a deduction of $4,265.80 as a loss sustained from flood damage. In explanation of the deduction they stated in the return that $1,589.24 of the deduction represented the actual costs of labor and material, mostly labor, "for saving the property from washing downhill" and that the remainder of the deduction, $2,676.56, represented the additional cost of landscaping work because of the flood. After making a field investigation of the petitioners' income tax liability for 1952 the respondent determined that of the deduction taken by petitioners, only the amount of $1,203.92 represented the cost to petitioners of restoring the property to the condition it was in before being damaged by the rainfall. Accordingly, he allowed the deduction in that amount and disallowed the remainder, $3,061.88.

## OPINION.

The question for determination is the amount allowable to petitioners for 1952 as a deduction under section 23 (e) (3) of the Internal Revenue Code of 1939 [1] as a casualty loss on account of the damage to their property at 150 Ashdale Place by the rainstorm which occurred during the period January 15 through January 18, 1952.

The petitioners take the position that they have established that their property had a fair market value of $87,053 immediately prior to the rainstorm and a fair market value of not more than $62,053 immediately after and that therefore under the general rule for measuring casualty losses on nonbusiness property they sustained a casualty loss in the amount of $25,000 which was deductible for 1952. The respondent contends that the only actual damage to the property from the rainstorm was restored by the petitioners at a cost of $1,203.92, which he has allowed as a deduction, and that the record fails to show that any greater amount was expended in restoring the damage, or that any greater amount was deductible as a casualty loss.

As was said in *Raymond Tank*, 29 T. C. 677 on appeal (C. A. 6) :

The general rule is that the measure of a casualty loss on nonbusiness property under section 23 (e) (3) is the difference between the fair market value of the property immediately before and after the casualty, but not in excess of the adjusted basis of the property, and diminished by any compensation derived from insurance or otherwise. *Helvering* v. *Owens*, 305 U. S. 468; *W. F. Harmon*, 13 T. C. 373, 383; I. T. 4032, 1950–2 C. B. 21.

At this point we observe that the record is silent as to whether, or to what extent, the petitioners were compensated by insurance or otherwise for the damage to their property. However since the parties have tried and briefed the case as though petitioners received no compensation, we proceed here on the assumption that none was received.

In support of their position the petitioners rely on the testimony of two witnesses produced by them and who have been engaged in the real estate business in Los Angeles for many years and who were familiar with the petitioners' property.

The testimony of those witnesses shows that from time to time over a period of many years the Los Angeles area has experienced earthquakes, rainstorms, earth slides, and other natural physical occurrences which have resulted in damage to mountainous and hillside

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

 *      *      *      *      *      *      *

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

 *      *      *      *      *      *      *

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * *

properties; and that immediately following such occurrences where considerable publicity has been given to the damage, as was the case of the rainstorm involved here, there exists a widespread fear or scare of mountainous or hillside properties which have suffered damage, with an almost complete lack of prospective purchasers and a substantial decline in the fair market value of the damaged properties. The testimony further shows that where the damage to the properties has been repaired and as the fear or scare subsides, prospective purchasers become more numerous, the demand for the properties returns to normal, and the properties return to the values they had prior to the rainstorms or other occurrences.

Each of petitioners' expert witnesses was of the opinion that immediately preceding the rainstorm here involved, the fair market value of the petitioners' property was equal to its cost to that time, or $87,053. One of the witnesses was of the opinion that the fair market value of the property immediately after the rainstorm was between $50,000 and $60,000 and the other thought such value was approximately $65,000. The foregoing opinions were based in part on the amount of physical damage to the property and in part on what the witnesses considered would have been an almost complete lack of prospective purchasers for or demand for the property. Neither of the witnesses stated the portion of the decline in value testified to by him which he attributed to physical damage or the portion which he attributed to lack of demand. Each of the witnesses expressed the opinion that petitioners' property has returned to the value it had immediately prior to the rainstorm and one of them was of the opinion that it had returned to that value by March 1954.

From the foregoing we think it is apparent that petitioners in claiming a loss of $25,000 are not only seeking a deduction on account of the physical damage to the property but also are seeking a deduction for a fluctuation in the value of the property which they have continued to own and which they have continued to occupy as a residence since March 1, 1952. In their income tax return for 1952 the petitioners deducted $4,265.80 as a casualty loss sustained on the property. The respondent determined that of that amount only $1,203.92 represented petitioners' cost in restoring the physical damage to the property and accordingly allowed the deduction to that extent. The record indicates that a portion of the amount deducted by petitioners represented improvements made to the property subsequent to the rainstorm and apparently for that reason the respondent disallowed the deduction in excess of $1,203.92. The record does not show nor do petitioners contend that any greater amount than $1,203.92 was required to restore the physical damage to the property. In this situation it appears that the portion of the $25,000, now sought as a de-

duction, in excess of $1,203.92, or $23,796.08, represents an amount attributable to a fluctuation in the value of the property.

To the extent the deduction claimed herein represents an amount attributable to a fluctuation in value of petitioners' property as a result of the rainstorm, the situation here is similar to that presented in *Citizens Bank of Weston*, 28 T. C. 717, affd. (C. A. 4, 1958) 252 F. 2d 425. In that case the basement of the taxpayer's banking building was inundated as a result of a flood which occurred in June 1950 and destroyed all of its bank records but which did no physical damage to the building. Following the flood the taxpayer ceased to use the basement for the storage of records but continued to use part of the basement for other purposes as before and also continued to use the upper floors of the building for banking purposes as theretofore. In its income tax return for 1950 the taxpayer took a casualty loss deduction in excess of $75,000 because of the fluctuation of, or decline in, the value of its banking building. In sustaining the respondent's disallowance of this deduction, this Court, relying on certain statements contained in *Weiss* v. *Wiener*, 279 U. S. 333, 335, said that "the time for the petitioner or any other taxpayer to claim a loss is the time when that loss is actually sustained, as evidenced by a completed and closed transaction, such as the sale of a building or its permanent abandonment. That did not happen here." In our opinion what was said there is applicable here.

Section 23 (e) (3) is concerned only with "losses sustained" during the taxable year arising from casualty. Where, as here, the alleged loss results merely from a fluctuation in value and was not "sustained" during the taxable year, the general rule for measuring casualty losses sustained on nonbusiness property is without application. Here no casualty loss in excess of the amount allowed by respondent was "sustained," consequently there is nothing to measure. Accordingly, the respondent's determination is sustained.

*Decision will be entered for the respondent.*